Verizon Communications Inc. v. United States Federal Communications Commission Scott Angstreich, Verizon. The FCC used an administrative process to find Verizon nearly $47 million. Can you raise the podium? If it goes up higher. It doesn't go up higher. I thought it did too. It's a little far from my eyes. So the FCC used an administrative process to find Verizon nearly $47 million. Earlier this month, the Fifth Circuit held that it violates the Seventh Amendment for the FCC to do so. And we agree. The penalty is legal. The rule the FCC enforced is analogous to common law actions. And it doesn't involve the public right. So Verizon was entitled to a jury before facing the penalty. And we agree that an after-the-fact trial doesn't solve the problem. An unpaid forfeiture order imposes concrete harm. And the only way Verizon could guarantee that it can challenge the FCC's legal rulings is to do what it did here. Give up a jury right, pay the forfeiture, and appeal. I have little to add to the Fifth Circuit's persuasive reasoning, which I'd encourage the Court to follow. But I do want to note that the capital traction case that the FCC cited for the first time on Friday is very different. There, the Supreme Court said that it doesn't unduly obstruct the Seventh Amendment for Congress to allow justices of the peace to hear claims for a modest amount. There, $300. That's about $12,000 in today's money. Because there, the losing party could bond to the judgment, immediately appeal to a real court with a real jury, which would not be bound by anything that had happened below. And that's a far cry from the statutory scheme here. Why is it such a far cry? I'm not trying to understand this. If the administrative agency says, we think you're liable for $47 million, and you think you're not, and you have a right to go to a jury for a de novo trial. But we don't have a right, Your Honor. We have a right for two reasons. First, we're not appealing, right? In capital traction, the loser could appeal to the Article III court. We sit and wait for five years, potentially, for the DOJ to do something, during which the FCC— Maybe they won't do anything. And if they don't do anything, you've won. No, we haven't, Your Honor, because in the intervening time, there's a reason repeat players don't flout forfeiture orders. We are before the FCC constantly. We have a $20 billion merger in front of the FCC right now. We have license applications or renewals constantly. And the FCC has made clear, and I don't hear them disavow you here, that they will use an unpaid forfeiture to the detriment of the party facing it. So I understand those consequences, and they strike me as severe. It's hard for me to understand exactly how they interface with the Seventh Amendment right. And I was thinking about it like this. Let's say the agency does an NAL and concludes liability, but doesn't impose a civil penalty. But all of those other consequences that you've identified exist in the world. Under JARCASE, we don't have the thing that is most important to the assessment of the Seventh Amendment right, which is a civil penalty that punishes or deters. So how do you understand what we do doctrinally with those collateral consequences that you're identifying? Sure. So I'm, you know, we went four years here between the notice of apparent liability and the forfeiture order. And the FCC doesn't expect anybody to pay a notice of apparent liability if you appeal it within the agency by filing written objections, which we did. And for the FCC's purposes, that's fine, just like I've never seen the FCC penalize a company that does what Verizon did here, which is pay the forfeiture and appeal. They take their wins, they take their losses, and they're good sports about it. But unpaid forfeitures, and I also have never seen, Your Honor, a notice of apparent liability that turned into a forfeiture order with a zero penalty. Those just don't exist. It's a null set. The joy of hypothetical thinking. Yes. And so during that intervening period, we are at massive risk. And even if the FCC is unlawfully exercising that discretion to punish us, they do it. And the FCC has not said in this case, in the Fifth Circuit case, in the DC Circuit case, that, like, if we just, you know, you can imagine a different forfeiture system, where rather than issuing an order that says pay us money within 30 days and we adjudicate you a violator, the FCC just makes a referral to DOJ. And if DOJ thinks it's legitimate and within the statute of limitations relevant to the actions, not the FCC's order, brings a lawsuit and we deny all the allegations. That's just a different world, and I would think that the FCC would be acting improperly if it used denials of allegations in court as somehow a basis to punish a party in other unrelated proceedings. But so that's one, Judge Lynch, to get to your question. But, two, the Stevens case says that we're going to do that. Well, I'm not sure I understand that. You just said you think the agency would be acting illegally. I would be inclined to think that's correct if it punishes you for taking advantage of a legal remedy that you have. Isn't that what you just said? I think if the world were different and forfeitures happened through, just like the SEC can do to go straight to court and not do any kind of administrative anything, but that's not the world we live in. We live in a world where the FCC has said, and it's said this since 1997, unpaid forfeitures can be used against the party who doesn't pay them in future proceedings. Well, what if you paid them in the protest? We did that here, and now we have to appeal. Yeah, so what if you did that and then said, and we want a jury trial? We can't get that, Your Honor. And we can't get that because Section 504A only gives that jury trial right in the context of an unpaid forfeiture. DOJ has to bring an action for collection. And if we paid it, there's no action for collection because there's nothing to collect. So that's reason one. Reason two is the Stevens case. And we are subject to jurisdiction in the Fifth Circuit. Yeah, but it doesn't bind us, and it's not our law. It's not De Novo. Does the Fifth Circuit not understand? De Novo means De Novo. Your Honor, I will note that the Fifth Circuit didn't make that up on their own. That was DOJ's position in that case. And I have also not heard, and DOJ is on this brief here, and I have not heard DOJ say that in future forfeiture cases, whether in district courts in this circuit or the Fifth Circuit or any other circuit, the DOJ has changed its mind and now thinks De Novo actually means – look, Your Honor, I agree with you. How do you have a trial without – a jury trial without instructing the jury? If you're going to instruct the jury – but then even let's assume, let's assume that what Congress has created is some weird hybrid where as a district judge I would have to instruct the jury according to the law of the FCC. Even if you think it's wrong. If that were the case, I don't know how many Article III judges would swallow that, but let's assume that were the case. Then when you appealed, you would be in the Court of Appeals, which has the jurisdiction to review the issues, the rulings of law by the FCC, as well as the jury instructions and other rulings of law made by the district court. So one way or another, you are not really – I can't imagine what kind of world it would be where a De Novo jury trial does not ultimately get you the ability to challenge the legal rulings as well as the factual rulings of the FCC. The real problem here is that mostly, in most cases, there are either going to be legal problems basically with the rule or there are going to be factual problems. The factual – if you think your problem is really with the facts, you want the jury to do that. If you think that the issue is really a problem of law, then you don't want to go through a process of let alone waiting five years, but even once the DOJ brings the thing, having a whole trial by jury about facts that are essentially undisputed. What you want is go directly to the Seventh Circuit or the Fifth Circuit or the Second Circuit. Do not pass go. Go directly there and make your legal arguments, which are not things that you have a right to a jury trial about anyway. So, Your Honor, we would certainly – in a world not bound by Stevens, one could move for summary judgment on those grounds as well. That would be another way to short-circuit the process. Here we do have legal arguments, and if we were in a world, we think a jury could hear facts and make decisions about the reasonableness of the FCC's – or the correctness of the FCC's conclusion that our procedures were unreasonable. I guess I'll just point out that I think it's hypocritical for the FCC to stand up here and say the NoVo trial is perfectly fine when DOJ's position is that Stevens was correct and correctly decided. And so the government, writ large, not just the FCC, but the government, writ large, is taking the position that that NoVo trial isn't actually the NoVo at all. And what facts would you be contesting in the jury trial? I think it's the implications from the facts. Right? The FCC – and I have other – I missed the word. I think it's the implications from the facts. I don't think there are disputes that, you know, the sheriff got access to 11 Verizon customers' information. And I apologize. I can't say some of this publicly due to a confidentiality error. But, you know, at one period of time, short period, many years in between, and another period of time, and that, you know, in a haystack of tens of millions of needles, we missed those 11. And the FCC says, ha-ha, bad guy got through. Your procedures are obviously unreasonable. And we think that is a wrong decision legally, or it's a mixed question of fact and law. We think that was a wrong decision to make. And that that's not evidence of anything other than it's a big old haystack. And those are the arguments that you made to us the first three or four before attacking on the jury trial, right, at the end. That's right. Going back to Judge Aitken's question, we do recognize that the court avoids constitutional questions where possible. And we think there are non-constitutional bases to vacate the FCC's decision. And I know I'm over time, but if I could talk about them for a little bit. Yes. So the first of them is we agree with now-chairman Carr. Device location information is not customer proprietary network information. And that's so for two reasons, either of which is sufficient. Verizon doesn't get the information solely by virtue of a carrier-customer relationship. And that's because with people who buy smartphones and smartphone service, Verizon has two relationships. When it sells voice services, and Judge Aitken remembers this from the NYSTA case, the Title II service, it has a carrier-customer relationship. But Verizon also sells Title I information services, Internet access and messaging. And it has a information service provider-customer relationship when it sells those services. We get information from both relationships, Your Honor. What if most people have both? What if almost everyone has both? Are there many people who have data only? Yes. So there are really two categories today. Twenty years ago when services were different, the makeup of the customer base was different. But today there are two groups. There are people who buy tablets and hotspots and wireless plans for those. They are data only. And we can get their device location information by virtue of that information service provider-customer relationship. And then there are people who have smartphones, and they have voice, data and messaging. It would be an interesting case if you applied some different rules and different procedures to the data only people and the voice only people or the voice and data people, right? No, Your Honor, because we get the information if you have either of those relationships with Verizon. Verizon can ping your device and roughly approximate the location. Right. So we can get that information by virtue of both relationships. And if you can get information by virtue of two things, you have not gotten it solely by virtue of one of them. And Congress wrote in a sole causation standard into the definition of customer proprietary network information. And we know it's sole causation because the Supreme Court in Houston says the nearly identical phrase, solely by reason of, means sole causation. Solely by reason of the relationship, right? The carrier-customer relationship. Carrier-customer relationship. Right. And if Congress wanted CP&I to be anybody you have a carrier-customer relationship with, it would have dropped the word solely, right? The FCC's example in the footnote, if there's a difference between information you get once you've signed up a customer versus when they're thinking of signing up, you don't need the word solely for that because until we've sold a product to you, we don't have a carrier-customer relationship at all. So your view then is that none of this is CP, CP&I. It's all outside of... Yes. It's really outside of what Congress is intending to regulate in any fashion. And so cell phone location... Device location information is not CP&I because we don't get it solely by virtue of that voice service relationship with the customer. And that's one reason. The second reason is that the location information that... Just pause because the FCC says, well, that just destroys CP&I. And I just want to make clear, that is not true. Verizon and other wireless carriers get lots of information solely by virtue of the sale of voice services. Call location information, call duration, metadata, which is, you know, right, relevant to all sorts of things. What telephone numbers are you calling? What times of day are you calling them? What kinds of voice service are you buying? All of that, even when Verizon is selling data services as well as voice services, we only get that information solely by virtue of having sold the voice services. Yeah, and most of that the government can get with a subpoena without a search warrant. And yet location information is something that the Supreme Court has found to be particularly sensitive because it enables the tracking of individuals as they move around in society so that it seems peculiar at the very least that Congress would create a system that allows your location to be tracked and that location data to be sold to all and sundry with no protections. So I don't think... All this other stuff is, oh, you can't touch that. So I don't think there are no protections. Chairman Carr, now Chairman Carr, notes in his dissent that the FTC is out there and the FTC is prohibited from regulating common carriers, but, again, Verizon is wearing two hats and Verizon is also an information service provider. But if we look at what Congress did in 1999, and this is now Chairman Carr's second reason, which we agree with, right, the original CP&I doesn't even mention location. Three years, the CP&I rules, location wasn't even CP&I. And then Congress adds it and it does three things. It puts in an elevated consent standard for call location information and only call location information. It puts in an exception for emergencies. And you can disclose call location information to emergency responders, to family, to the database providers that assist in emergencies. Right, and both of those provisions use the term call location. They do. But the word location is injected without call. It is, and I think it reads way too much into what Congress did to say that the missing word there. First of all, if you just drop it in the definition with call location information, as we note in the footnote, it reads quite oddly. But also the commission's position, which, again, is not what they said in 2013, when they said the straightforward reading is that it means call location information. It's not just me saying it. It was the commission's position not that long ago. Is that Congress cared a lot, apparently, to have expressed consent for call location information where your phone is those few times of the day you're on the phone to make a call, and all the other times of the day, the rest of the 23 hours and 37 minutes of the day, device location information is free for all if you opt out, if you don't opt out. That's crazy to me. The notion that Congress would say we're really concerned about making sure that police and fire and ambulances can find you in an emergency if you can make a call, but if you can't make a call, if all you can do is text or e-mail or your phone is aware you've been in a crash but you're incapacitated, the exception doesn't apply. And that's just a crazy thing to attribute to Congress. And so we think the best way to read the addition of location to CP&I happening at the same time as the enhanced consent standard and the exceptions came in is that Congress was talking about call location information in all three places, just like the commission said was the straightforward reading in 2013. If you'll indulge me on the penalty, any act, single act or failure to act, in 1989 Congress sets two caps on the FC's forfeiture authority involving common carriers. For a single discrete act, it's $100,000. For a continuing violation, it maxes out at ten times that or a million. In 2015 Congress says we should increase all these penalties by inflation. And so in 2020 it was about $2 million for a continuing violation, $200,000 for a one-off. There was one violation here. Under any ordinary reading of single act or failure to act, the FCC decided, and we disagree with that, but the FCC decided that the procedures Verizon put in place to ensure that requests for information based on consent of the customer actually happened. The customer actually consented. And it doesn't matter that the agreements with the 60 service providers were, they were separate agreements. I don't think it does, because that's not the violation the FCC found. Why is the violation for every individual whose data was made available without adequate safeguards? Why aren't there millions of violations? So the FCC says, and they're very silent about this in their brief. They could have reached that conclusion. And I think that just shows that the FCC thinks any single act or failure to act is meaningless. If the same set of facts could turn into one violation, 63 violations, or tens of millions of violations. I'm afraid I'm an old criminal lawyer. And it is always, often the case, I should say it's often the case, Congress passes a statute, there's a maximum penalty for a violation, but then one has to decide what is the so-called unit of the offense. And sometimes one can pile up lots of violations and multiply the prison terms and multiply the fines. And that's a pretty standard situation. And I'm not sure why I understand why a different standard should apply here with a civil violation. Why isn't it the case that every time they fail to protect my data, if it was just my data that they didn't have good enough protections on, that would be one violation, wouldn't it? And I think you would. And would be eligible for whatever those penalties would be. And, Your Honor, I think you could talk to people. And if they don't do my data or your data or her data or all those people's data, why isn't that a whole bunch of violations? And, of course, that leaves prosecutorial discretion. And prosecutors will often lump these things together and do things like, okay, we're not going to charge you with 10 million violations. We'll charge you with 60. I think the right reading of the statute is that Congress wasn't giving the FCC the discretion to chop up a set of facts into whatever came up with the penalty that it thought was most important. But why is it a single act to totally fail to protect people for all of your customers? Why is that a single act? And yet, if you had two different, you know, rather minor things, that would be two acts. So the failure the FCC identified here is that we didn't inspect or take measures to ensure that when, say, AAA says, you know, Bob needs a tow and authorized me to figure out where his cell phone is so I could send the tow truck to the right place, we didn't do something to ensure that Bob had actually done that. And that wasn't Bob specific. For the actual disclosures, right? The liability pertains to the failure to take reasonable procedures. It is the failure to have put in place a procedure where we would have, as a carrier, I guess, called Bob and said, hey, Bob, did you really do that, and made sure that Bob told us or maybe sent a text message that asked for extra, extra confirmation that AAA wasn't making it up. We did lots of other things. We didn't do that one thing. I think that's aptly described as one violation, regardless of how big our business is or how many reputable companies are participating in the program. Yeah, what if some of them aren't so reputable? I mean, you know, you come back to AAA and 911, and there are a couple of sort of things that I think you quite reasonably made the argument that these were very valuable services with very reputable entities, and you should have been allowed time to wind those down. What about all the other 58? So there's a list of them in the joint appendix. I don't have the page, but I believe it's attached to Exhibit D, to our response to the Notice of Apparent Liability. The FCC has never suggested that we fell down on our task of vetting participants in the program. You know, the record does show, and it's a document the FCC likes to quote out of context, that there was a sketchy bail bonds company, which we did not let into the program. So, you know, and the period for which we were penalized, the one company that everybody knows violated the program terms wasn't part of the program anymore. So there's no suggestion that the people left in the program were sketchy in any way, shape, or form, or that Verizon wouldn't have caught sketchiness if they were, just like it did for that bail bonds company it didn't let in. What we really have here is, at least as of Verizon, right, the FCC goes on and on. There were hundreds of these Hutchison attempts to get location information, but 20 of the hundred were Verizon, and nearly half of them failed. So whatever was happening with other carriers, and I don't have a brief to argue for them, Verizon's program was robust, and there is extremely little evidence, right, there's no evidence at all that Securus's alternative law enforcement portal was ever used by any law enforcement, like bona fide law enforcement, forget the crazy sheriff, but by any bona fide law enforcement official, because we had a process, the subpoena process, as you mentioned, outside of that system that was well functioning and commonly used. So we've got 11 needles in a massive haystack, and that somehow shows that the many layered procedures we put in place were so bad that if we didn't fix them in 30 days, we're on the hook for $47 million. When the FCC knew about them for seven months and did nothing, didn't tell us, didn't start an enforcement proceeding, did nothing at all. Another thing you hear, nothing about in their brief. I've taken a lot of your time, and I appreciate you. It's been a long day. There's no questions. Just go longer after you're done. Thank you. Good morning, Your Honors, or I suppose good afternoon. I'm Scott Noveck for the FCC and the United States. I'd like to start by addressing the Fifth Circuit's decision in the AT&T case, because we think the Fifth Circuit got this one wrong. There's no Seventh Amendment problem here, because Verizon had the opportunity to request a de novo jury trial in federal district court before it could be made to pay any penalty. Verizon instead sought director's help. They had the ability to request a jury trial. Is that framing accurate? I mean, they can't affirmatively bring the trial. They can refuse to pay and then wait for the government to bring a trial. Isn't that? So, Your Honor, my hedge is only because if the government, suppose the government immediately brings an enforcement action and we're in court, you can always demand a jury trial. It doesn't mean you're necessarily entitled to one. If, for instance, there's no issue of material facts, there might be summary judgments. So the most the Seventh Amendment ever can require is that you'd be able to demand a jury trial, and then whether you receive one or not is sometimes determined by the substantive standards that apply. The, you know, I take your argument. Well, I don't think that was quite the question. The question is they can't trigger any kind of trial at all. They have to wait for the government to, in its good time, choose to come after them. And in the meantime, they're claiming that you will treat them as scofflaws. Is that the case? No, Your Honor. There are a number of points there that I think are inaccurate. Maybe I'll start with the last point. If you take a look at Section 504C of the Act, Section 504C provides that the FCC cannot rely on a contested forfeiture. It hasn't been upheld by a court in any FCC proceeding. What my friend on the other side points to is that FCC policy statement stating that there may be circumstances where the FCC, say, in a subsequent forfeiture proceeding, would be relying not on the fact of the prior forfeiture if it hasn't been adjudicated, but there could be situations where the underlying facts are relevant. If, for instance, there's a question about whether there's willful and repeated conduct, whether that prior conduct had taken place. But that's something we could do whether or not there had been a prior forfeiture. So that's not something that's enhanced by a forfeiture that somehow hasn't been adjudicated. Turning back from there. So you can't do anything with a final forfeiture order that hasn't been paid? Not based on the fact of the forfeiture, no, Your Honor. If it hasn't been either paid or ordered by a court to be paid. Okay. But if there are findings of fact in that final forfeiture order? I don't think we could rely on those findings of fact as such, rely on the prior findings as if they're in some way preclusive. I think that if a subsequent situation arises where there's overlap and facts that are relevant, I think we could rely on that. I mean, I don't think that's unfamiliar, for instance, in a criminal sentencing context if you have a sentence that turns on a, you know, prior unadjudicated conduct or a prior offense that was dropped. So I guess the point is we have to distinguish between the forfeiture and whether the forfeiture itself has any effect or underlying facts which the Commission could rely on regardless of whether there had been a previous forfeiture. But even if you don't agree with me on this, this is another point I want to make in response to Judge Lynch's question. There is a safety valve, which is that both the D.C. Circuit in the Pleasant Broadcasting case and the Ninth Circuit in Duvian have said that if you really have a situation where a company can show that it's facing some imminent real-world harm because of a forfeiture that hasn't yet gone to trial, then in that situation the company could file a declaratory judgment action in district court and obtain a prompt adjudication that way. So we think that safety valve is available as well. I'd like, Your Honors, if I may, to briefly address one other point that the – But would they have a right to a jury in a declaratory judgment action? Wouldn't that be an equitable action? So our understanding, Your Honor, at first predicated on the fact that a declaratory judgment action could be brought. Our understanding is that it operates as a trial in reverse – or sorry, as a lawsuit in reverse. And if it turns out that in order for the court to adjudicate that case, the Seventh Amendment requires a jury determination, then we don't see any obstacle to a court convening a jury trial in that instance. I don't know this is something that would come up with frequency, but we don't see an obstacle to that happening as a safety valve should there, in fact, be a situation of imminent harm. I also want to briefly address one other representation about the government's position on Stevens that I don't think was accurately represented. We've said in our brief, and we'll say today, that we think Stevens is in significant doubt, especially in light of subsequent Supreme Court cases. And not in doubt with the circuit. I mean, they confirmed in their recent decision that it means not a bit of a trial, right? Your Honor, I'll take that point. Of course, that's not the law of this circuit. It doesn't bind this circuit. And we think that when this circuit analyzes it, there is a real doubt about that in light of, I think, two subsequent Supreme Court cases. One is, of course, jargocy. If Stevens is creating an outcome that's unconstitutional under jargocy, we think what that means is Stevens, or any interpretation like Stevens, should no longer be applied or be good law after jargocy. I'm a little confused by the Fifth Circuit, upon finding a constitutional violation, chose to adhere to Stevens rather than overturn that as the remedy. We think the proper remedy would be to say Stevens is wrong, not to call into question the FCC's entire enforcement apparatus. And we think that Stevens is also in significant tension with the Supreme Court's decision in PDR Network and with a pending case now called McLaughlin, which is a follow-up on the same issue. So your understanding of de novo trial means it looks just like a trial, that the district court makes foolings of law and the jury makes findings of fact, that there's no difference, no restriction. Yes, Your Honor. That's our position. And I guess the way we get there is in the McLaughlin case, which is now pending at the Supreme Court, was argued in January, and I imagine we're going to get some clarity on this soon. The government's position was that preclusion under the Hobbs Act has to be read against the background principle of Section 703 of the APA, as cited by the Supreme Court in PDR Network, which said that whether there's preclusion of an argument depends on whether there was a prior, adequate, and exclusive opportunity to raise that argument at some earlier juncture. And I think Verizon's position would be that the opportunity for a Hobbs Act appeal wouldn't be an adequate substitute for raising its legal arguments in district court because it would have to give up its jury trial right. So in that sense, we don't think Verizon is correct, that the Hobbs Act would or should preclude it from raising any relevant arguments in that trial de novo. We take the statute at its word that de novo there means de novo. Two other brief points here on this Seventh Amendment issue. First point, just to directly address the Fifth Circuit's reasoning and why it thought that a trial de novo is insufficient, it said that's because the — that opportunity would come after the agency process is concluded. And as our 28J letter explains, that's contrary to Supreme Court precedent, which says that a trial de novo is sufficient even if it comes on appeal. And I'm not sure I fully understood my friend's effort to distinguish that. I think he said it was because the case that we cited only involved a $300 penalty. Well, the Seventh Amendment sets the monetary threshold at $20, so I'm not sure I see any basis to draw other distinctions beyond that amount. The other point that I wanted to briefly raise here is the other policy concerns that were raised by the Fifth Circuit, which we don't think hold up to inspection. The Fifth Circuit was concerned about things like reputational harm, which I think the Court recognized doesn't implicate the Seventh Amendment. The Seventh Amendment is specifically about suits for money damages. And if the commission here had instead sought just injunctive relief, not monetary damages, presumably there would have been the same or similar reputational harm, but that wouldn't trigger the Seventh Amendment. And, of course, a company can always simply deny any wrongdoing and say that it will ultimately be vindicated in court. So we don't think there's any Seventh Amendment injury that's been shown here. If I may turn to some of the other issues. On the statutory issue, I guess what I think would be – Could I ask you on – Please. – on damages? Yes. So the briefs felt a little like they were ships passing on this. It seems to me you're arguing that the agency has discretion and acted reasonably here, not arbitrating capricious, in concluding that each of the contracts constitutes a separate act. Is that what you're arguing? So, you know, I think there are two ways to look at it, and I think we prevail either way. One is, I think, as you're describing, and as I take Judge Lynch, who I've been describing earlier, if you view this as a matter of prosecutorial discretion in how to charge an offense, we think that what the commission did here was reasonable. But we also think simply that, as a matter of judgment, what the commission did was correct. And I'm happy to explain.  I mean, on the reasonable point, I mean, that – I think when the amicus briefs suggested this, that that's dancing with the ghost of Chevron, that it's a statutory interpretation question here under liberal right, what the meaning of a single act or failure to act is in the context of the statute. And so I don't – I'm not sure why that isn't the question, and then what is your statutory – I suppose the next part of your response is how you interpret the statute. But I don't know why we would give you deference to make that decision. I guess the only – there's some uncertainty here because the statute doesn't seem to speak directly to what the unit of analysis or unit of offense is. So there is still some question, even after Loper-Bright, about, you know, whether things constitute delegations in certain instances. But even if the Court wants to review this just de novo, I think that in order to apply to a wide range of different kinds of wrongdoing, we need to look to the nature of the underlying conduct that violated the law. And what the Commission said here was that it thought there was a separate violation for each one of the relationships Verizon had with a different entity that it provided this information to without adequate safeguards. And there's two reasons why I think that was correct. First reason is that Verizon approved each entity's participation in this program separately, individually, and it also actually terminated them from the program later separately. You'll see that it did so in two tranches. And the second point is that if you look at the nature of what actually – the misconduct that actually consummated that occurred here, the problem occurred because of an unfaithful provider in the program who wound up misusing data. So each additional provider who you allow to participate in this program, each with, creates another risk of what ultimately transpired, which is that one of those providers will misuse the data or be unfaithful in some way. So it makes sense to us that actually the risks do scale with the number of providers in the program, that each provider be treated as a separate violation. Well, but why is that necessarily? I mean, I understand the theory, but as a matter of fact, most of these providers as far as we can tell were faithful. And so the – Verizon's position, I thought, is that you can't take in isolation our failure to audit everyone to death. We've had a program that involved vetting at the front end of the companies and a certain set of audit procedures. Why isn't the Securis story a story of insufficient vetting as much as it could have been prevented if they had extraordinarily elaborate procedures? It also could have been prevented if they had a better system for deciding who to let in and who not to let in. So I want to take that from a couple of different avenues, so I apologize that this may take some time. I think there are multiple different layers at which failures took place that the Commission acted for here. And at the broadest level, the actual penalties here are not for those underlying breaches, but for the lack of proper remedial action once the breaches came to light, which is entirely independent of any of those arguments that were made. The core of this case is that when the New York Times article came out, that put Verizon on notice that the protections it had in place for its customer information were ineffective, that in essence it wasn't in meaningful control of protected information that it was sharing with its commercial partners. And the reasonable response to this, which the Commission sets out at pages 135 to 137 of the Joint Appendix, would have been either to promptly identify and fix the underlying problem, or if it couldn't do so, to stop sharing information with third parties. Why is it not a reasonable response to look into who these people are, terminate the one bad actor that they know about, and then see whether everybody needs to be terminated? And eventually they decided to do that. And once they decided to do that, they still left in place a few where they believed that these were highly reputable institutions and ones that provided a genuinely valuable service to the customers. Now, when you're talking about a negligence standard, in effect, a reasonable person standard, I don't understand why it is not permissible to take into account what the values to be achieved by leaving this program in place. Some of the values just will make money, and these guys will make money. And if that's all that's happening, maybe you want to be a little suspicious of whether the guys who are making money off this program are the ones who are telling you, yeah, we got the consent. But maybe when you have some other set of systems or some other set of actors, you don't think that they have an incentive to cheat on you. Why isn't that a reasonable thing to do? Well, so I'll appeal in a couple of different ways. One is that, and again, I refer the Court to pages 135 to 137 of the Joint Appendix. It's pages 75 to 79 of the Notice of Apparent Liability. There were things that Verizon could and perhaps should have done which wouldn't require terminating the program. We know, for instance, Verizon trialed a direct location service where Verizon itself, you know, when someone sought location data, would ping or text the customer saying someone sought this information, do you approve it? That would have put everything in Verizon's control. It would have had stronger safeguards. So there were things that could have been done even if you're keeping the program going. But I guess if I'm kind of peeling the onion down another layer, I think it's helpful to understand exactly what was wrong and went wrong with the program that Verizon did have in place, which is that Verizon, beyond just its background checks of which we know turned out to be unsuccessful because Securus was a company they vetted, let in, turned out to be unfaithful. So I don't think we can assume anything about the other participants it allowed to continue in light of that. But Verizon then said it was doing some sort of audits to make sure that they were adhering to the program properly. But those audits had two, I think in retrospect, obvious flaws. One was that they were unable to detect when a provider like Securus was just falsifying the consent records. It relied on self-reported data from these providers. And Verizon was warned about that in a 2017 internal report and didn't fix that vulnerability and didn't do so after the New York Times article either. And the other problem was that Verizon's audits were unable to detect if data was being requested by one of these providers, not for its authorized use case, but for an unauthorized use case, which Securus was doing for four years without it being detected. So we think that, you know, once the New York Times article came to light and there was an opportunity to find out what was going wrong, how did this happen, that certainly the one course that was not appropriate was for Verizon to continue selling this information to third parties for the better part of a year on essentially the same terms and under essentially the same system that had already been exploited. We don't think that's reasonable by any means. If I may turn very briefly. Why is that? But, I mean, I can hear that, and I suppose if we were dealing with a jury verdict, I would probably say, well, jury made its mind up. But do you get the same deference there? Why aren't we looking ourselves at what is a reasonable approach? I mean, how long do they have to, you say, to continue doing this for a year? What if it was two months? You're acting as if something should have happened like instantare. Why don't they get the opportunity, given particularly that there still is no evidence that anyone else actually abused the program, right? Why shouldn't we give them some benefit of the doubt here? Well, I think the commission already did so. The commission in analyzing this had a 30-day grace period, thought 30 days should have been a period in which you could investigate, you could identify the flaw, you could take whatever other remedial steps are necessary. And, you know, if Verizon wanted to quibble, should that have been 60 days, 90 days? But I'll note they're not in here arguing that the 30-day grace period wasn't longer. So I think they forfeited any arguments to that effect. And anything like that when I think of just the fact the penalty at the margins, if you wanted to exclude some days from the calculation. Well, I don't know. Why do we want to say, for example, that this was egregious? What makes this egregious? It is they were behaving apparently in accord with the industry standard because everybody else got the same, was doing the same thing and was getting punished the same way. So what does egregious mean? I can understand that the fact that everybody does it doesn't make it right. But the fact that everybody does it makes it a little hard to single any one of these people out and say they were doing something outrageous. Am I wrong about that? There were two points I think I'd make as to egregiousness. One is that there were prior warnings here. There was a 2007 CP&I order in which the commission specifically warned that relying on contractual safeguards to shift responsibility for protecting this information to third parties is not sufficient, and that's exactly what Verizon did here. It also had that 2017 internal report, which found that we have a vulnerability if one of these providers who were relying on to self-report the consent records is falsifying those records. It did nothing in response to that. That wound up being a risk. But what it didn't have was anything from the FCC. When you knew about the securities violation before the New York Times made it public, why not send an alert to all these companies? Look at the kind of stuff that's going on here. You better take some steps to fix this. I don't think that's factually correct or fair, Your Honor. And I'll detail that, but before I do so, I do think it's a little bit neither here nor there in that there's no unclean hands defense. This is really about did the carriers comply with their obligation under the statute. But turning to the underlying facts, I think that what you've gotten from Verizon is a very misleading picture of what happened. What happened here that they're pointing to, as we've best been able to unravel it, is that in a separate unrelated FCC proceeding handled by different staff in a different FCC bureau, apparently also involving Securus, an entity that was opposed to Securus said that Securus is untruthful and threw in a filing that alleged two things. It alleged that an employee of Securus had been testified, had been subpoenaed to appear as a witness at a criminal trial of a Missouri sheriff, and they tendered a copy of a civil complaint with unproven allegations that the sheriff had been able to obtain location data using, without having the proper legal paperwork. Of course, this can be obtained with the proper legal paperwork. None of that was the kind of thing that jumped at anyone or put anyone on notice at the FCC, fairly unnoticed, that this program had the severe flaws that were in place. We didn't know about that until the New York Times article came about. And I think if you take a look at that article and the reactions of everyone quoted in that article and the actions that took place afterwards, this is in fact something that came to the agency and to everyone as a surprise. This is not something the agency was consciously aware of in some sense and chose to disregard. And if you're getting that idea from the filings, I don't think that the actual record bears that out. The, at least, last point that I'd like to make sure I get to briefly touch on, as I see that I'm over my time, is on the statutory language of Section 222 and some of this solely by virtue of the customer-carrier relationship language, we think that the key to understanding that is the term relationship. And that relationship can naturally encompass multiple services. Just as a practical matter, in the wireless marketplace, wireless customers don't have separate relationships for each different service they purchase. You generally can't have your phone get voice service from AT&T, but text messaging from Verizon and wireless internet from T-Mobile. You're going to need to get your data services from the same provider who's providing the voice service to your phone number. And so not surprisingly, you see that voice and data service are usually charged together on the same bill because they're part of a single customer relationship. And if you look at text messaging in particular, Verizon says text messaging is a data service. But in the market today, if you purchase voice service, voice service almost universally comes with text messaging bundled in for free. You can't unbundle them. If you're buying voice service, the text messaging comes free. And under Verizon's view, simply by bundling in text messaging free alongside that voice service, all of a sudden that effectively negates their obligation to protect the customer location data as would otherwise be required under Section 222. We don't think that's a reasonable reading of the statute. Congress doesn't ordinarily write self-defeating statutes like that. If there are any other questions from the Court, I'd be happy to answer them. If not, then we simply ask that you deny the petition for review. Thank you. All right. Thank you, Mr. Novak. And we have some liberal. Thank you, Your Honors. To hit a few points quickly. The capital traction case I'd point you to page 45. I recognize 1899 Supreme Court cases write things a bit differently. But it's clear that what drove the analysis there was the combination of the modest amount that was allowed to be done, the ability to bond it and immediately appeal and get a jury trial right. Mr. Novak pointed to a declaratory ruling. And all I have is the D.C. Circuit saying in Pleasant Broadcasting, we assume this could be done. And that was in 1977. We're a long way from then, and it's never been done to my knowledge. And I don't know that it could be done, let alone that you'd get a jury trial on it. As far as the relationship goes, it's not relationship standing alone. It's carrier-customer relationship. And at the same time Congress enacted that text, it defined what it means to be a carrier in Section 153.51. And it said that you are only a carrier to the extent that you are engaged in providing telecommunications services. And it's not me who says messaging isn't a telecommunications service. It was the FCC that said that in their declaratory ruling. And bundling the services doesn't take the voice services out of CP&I. It just means that for information that we get by virtue of both services, we're not getting it solely by virtue of the carrier-customer relationship. Going back to the Seventh Amendment, I hear what Mr. Novak says, but again the FCC thinks it can use its findings as to what the facts mean to penalize people. That's what it said in 1997. That's what it has done ever since. That's the reason why carriers who are repeat playwrights. The only forfeiture orders you see are, like Stevens, a pirate radio station that was fined $10,000. Pirate radio stations are not in the business of doing business with the FCC. That's why they're pirates. And then I guess finally on the reasonableness of the protections, all we learned from the New York Times article, which literally reported the exact same things that the FCC was told, and that the FCC said in its order would be better addressed through enforcement proceedings, that's Paragraph 28 of the Securus Order, was that our systems weren't perfect. And perfection isn't the standard. It's reasonableness. And we thought we had a reasonable program. We took steps to improve that program. We think those steps were reasonable. At bottom, there are lots of ways for this Court to vacate the order, whether it's under the statute, it's because the penalty gives absolutely no meaning to single act or failure to act, because the FCC was wrong to think that 11 needles in a very large haystack showed massive failings in our system, or for the Fifth Circuit's reasons, because this violates the Seventh Amendment. We urge the Court to vacate it on at least one, if not multiple, reasons. Thank you. Thank you both. We will take the case under advisement.